Marc J. Randazza, CA Bar No. 269535
Alex J. Shepard, CA Bar No. 295058
RANDAZZA LEGAL GROUP, PLLC
8991 W. Flamingo Rd., Ste. B
Las Vegas, Nevada 89147
Telephone: 702-420-2001
ecf@randazza.com

Carrie Goldberg (*pro hac vice* forthcoming)
C.A. GOLDBERG, PLLC
16 Court St, 33rd Floor
Brooklyn, NY 11241
Telephone: 646-666-8908
carrie@cagoldberglaw.com

*Attorneys for Defendant and Counterclaim-Plaintiff,*
*Cheryl Bawtinheimer*

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| Rapid Relief Team (RRT) Ltd., <br><br>      Plaintiff and Counterclaim-Defendant, <br><br> vs. <br><br> Cheryl Bawtinheimer, <br><br>      Defendant and Counterclaim-Plaintiff. <br><br> vs. <br><br> Brown Rudnick LLP, Katy-Jade Church, and Michael Graif, <br><br>      Counterclaim-Defendants | Case No.: 4:25-cv-10864-JST <br> JUDGE: Hon. Jon S. Tigar <br><br> **DEFENDANT AND COUNTER CLAIM-PLAINTIFF CHERYL BAWTINHEIMER'S MOTION FOR PRELIMINARY INJUNCTION** <br> **-AND-** <br> **MEMORANDUM IN SUPPORT** <br><br> **DATE: May 14, 2026** <br> **TIME: 2:00 p.m.** |

Cheryl Bawtinheimer's Motion for a Preliminary Injunction

**TABLE OF CONTENTS**

MOTION FOR A PRELIMINARY INJUNCTION.................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................ 1

1.0     INTRODUCTION .............................................................................................. 1

2.0     FACTUAL BACKGROUND................................................................................ 2

2.1.    The Plymouth Brethren Christian Church ............................................... 2

2.2.    The DMCA Requests and Bawtinheimer's Videos ...................................... 6

3.0     LEGAL STANDARD........................................................................................... 13

4.0     ARGUMENT ...................................................................................................... 13

4.1.    Bawtinheimer Has a Likelihood of Success on Her Claims .................................. 13

4.1.1   Bawtinheimer Clearly Did Not Infringe RRT's Copyright ................................. 14

4.1.2   Factor One:  Purpose and Character of the Use ...................................... 14

4.1.3   Factor Two: The Nature of the Copyrighted Work .............................................. 16

4.1.4   Factor Three: Amount and Substantiality ................................................ 17

4.1.5   Factor Four: Effect on the Market for the Original............................................. 17

4.1.6   Counterclaim-Defendants Clearly Violated 17 U.S.C. § 512(f).......................... 18

4.2.    Bawtinheimer Will Suffer Irreparable Harm Without the Injunction...................... 21

4.3.    The Remaining Preliminary Injunction Factors Favor Bawtinheimer...................... 22

4.4.    The Court Should Require, at Most, a Nominal Bond............................................ 22

5.0     CONCLUSION.................................................................................................. 23

**TABLE OF AUTHORITIES**

**Cases**

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011)......................................................................... 13

*Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*,
790 F. Supp. 2d 1024 (N.D. Cal. 2011) ......................................................... 13

*Andy Warhol Fdn. v. Goldsmith*,
598 U.S. 508 (2023) ....................................................................................... 14

*Beyond Blond Prods. v. Heldman*,
479 F. Supp. 3d 874 (C.D. Cal. 2020).......................................................... 22

*Bollea v. Gawker Media, LLC*,
913 F. Supp. 2d 1325 (M.D. Fla. 2012) ........................................................ 18

*Bouchat v. Baltimore Ravens*,
737 F.3d 932 (4th Cir. 2013)................................................................... 15, 17

*Burstyn v. Wilson*,
343 U.S. 495 (1952) ....................................................................................... 15

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) ........................................................................... 14, 15, 18

*Channel 781 News v. Waltham Community Access Corp.*,
761 F. Supp. 3d 371 (D. Mass. 2025) ............................................................ 19

*Design Furnishings, Inc. v. Zen Path, LLC*,
2010 U.S. Dist. LEXIS 135819 (E.D. Cal. Dec. 23, 2010)............................ 13

*Dhillon v. Doe*,
2014 U.S. Dist. LEXIS 24676 (N.D. Cal. Feb. 25, 2014)............................. 16

*Freedom Holdings, Inc. v. Spitzer*,
408 F.3d 112 (2d Cir. 2005)........................................................................... 21

*Garcia v. Google*,
786 F.3d 733 (9th Cir. 2015).............................................................. 13, 14, 18

*Hachette Book Grp. v. Internet Archive*,
115 F.4th 163 (2d Cir. 2024)......................................................................... 18

*Hannley v. Mann*,
2023 U.S. Dist. LEXIS 40022 (C.D. Cal. Mar. 8, 2023) .............................. 16

*Hill v. Xyquad, Inc.*,
    939 F.2d 627 (8th Cir. 1991) ............................................................................... 21

*Hoffman v. Capital Cities/ABC, Inc.*,
    255 F.3d 1180 (9th Cir. 2001) ............................................................................. 15

*Hollister v. Sims*,
    2026 U.S. Dist. LEXIS 47709 (C.D. Cal. Jan. 30, 2026) ....................................... 19

*Hustler Magazine, Inc. v. Moral Majority, Inc.*,
    796 F.2d 1148 (9th Cir. 1986) ........................................................................ 15, 17

*In re DMCA § 512(H) Subpoena to Twitter, Inc.*,
    608 F. Supp. 3d 868 (N.D. Cal. 2022) ................................................................. 15

*Invisible Narratives v. Next Level Apps Tec.-FZCO*,
    No. 25-cv-01644-NW, 2025 U.S. Dist. LEXIS 29888 (N.D. Cal. Feb. 19, 2025) ............. 19, 21

*Jorgensen v. Cassiday*,
    320 F.3d 906 (9th Cir. 2003) ............................................................................... 22

*Katz v. Chevaldina*,
    2014 U.S. Dist. LEXIS 88085 (S.D. Fla. June 17, 2014) ....................................... 16

*Lenz v. Universal Music Corp.*,
    815 F.3d 1145 (9th Cir. 2016) ........................................................................... 2, 20

*Mattel Inc. v. Walking Mountain Prods.*,
    353 F.3d 792 (9th Cir. 2003) ............................................................................... 16

*New York Times v. Sullivan*,
    376 U.S. 254 (1964) ............................................................................................ 15

*Savage v. Council on Am.-Islamic Rels., Inc.*,
    2008 U.S. Dist. LEXIS 60545 (N.D. Cal. July 25, 2008) ....................................... 18

*Seltzer v. Green Day, Inc.*,
    725 F.3d 1170 (9th Cir. 2013) ............................................................................. 15

*Stewart v. Abend*,
    495 U.S. 207 (1990) ............................................................................................ 14

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001) ............................................................................... 21

*Tobinick v. Novella*,
    848 F.3d 935 (11th Cir. 2017 ............................................................................... 15

*UMG Recordings, Inc. v. Augusto*,
    558 F. Supp. 2d 1055 (C.D. Cal. 2008), *aff'd*, 628 F.3d 1175 (9th Cir. 2011) .......................... 19

Cheryl Bawtinheimer's Motion for a Preliminary Injunction

*United States v. United Foods, Inc.*,
  533 U.S. 405 (2001) ................................................................................................ 15

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
  227 F.3d 1110 (9th Cir. 2000)................................................................................. 17

**Statutes**

17 U.S.C. § 107.......................................................................................................... 14, 17

17 U.S.C. § 512........................................................................................................... passim

## MOTION FOR A PRELIMINARY INJUNCTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that Defendant and Counterclaim-Plaintiff Cheryl Bawtinheimer will and hereby does move for a preliminary injunction against Plaintiff Rapid Relief Team Ltd. ("RRT") and Counterclaim-Defendants Brown Rudnick LLP ("Brown Rudnick"), Katy-Jade Church, and Michael Graif (collectively, "Defendants"), on May 14, 2026, at 2:00 PM, at the Ronald V. Dellums Federal Building & United States Courthouse, located at 1301 Clay Street, Oakland, CA 94612.

This Motion requests the Court to decide the following issues: (1) whether Bawtinheimer's YouTube videos using RRT's cartoon logo as part of criticism of RRT and its parent entity are fair uses; (2) whether Counterclaim-Defendants issued DMCA notices in bad faith; (3) whether Bawtinheimer will suffer irreparable harm in the absence of an injunction; (4) whether the balance of hardships tips in Bawtinheimer's favor; and (5) whether the public interest would be disserved by the requested injunction.

Bawtinheimer seeks an order from this Court: (1) requiring Defendants to withdraw all DMCA requests sent to YouTube regarding Bawtinheimer's videos; (2) enjoining Defendants from sending any more DMCA notices or other legal threats regarding these videos or any other clearly non-infringing videos; and (3) requiring Counterclaim-Defendants to seek approval from this Court to send any further DMCA notices regarding Bawtinheimer's videos.

## MEMORANDUM OF POINTS AND AUTHORITIES

**1.0    INTRODUCTION**

RRT filed abusive takedown requests under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512(c), to suppress Cheryl Bawtinheimer's First Amendment protected speech. Those notices were signed under penalty of perjury by Counterclaim-Defendants Katy-

Jade Church and Michael Graif.  When the DMCA notices were issued, those who issued them had actual knowledge or willful blindness[1] that their notices were in bad faith. A preliminary injunction should issue to restore Bawtinheimer's free speech rights and to shield her from further unlawful interference by Counterclaim-Defendants.

Bawtinheimer is a former member of the Plymouth Brethren Christian Church ("PBCC"), also known as the Exclusive Brethren. RRT is ostensibly a charitable organization operated by the PBCC, but in reality does minimally impactful charitable work while being used to bolster PBCC's image. Bolstering is desirable because the PBCC has a history of abuse toward its members and those who leave it.

Bawtinheimer produces the Get A Life Podcast ("GAL"), in which she and other former PBCC members criticize the PBCC and RRT and serve as a source of comfort and community for other former members who find themselves excommunicated and alone. Defendants' DMCA requests abused the DMCA for the purpose of suppressing criticism. After filing its Complaint, RRT continued to send frivolous DMCA requests, using the existence of this suit to try to legitimize them, to keep Bawtinheimer's critical videos suppressed.

## 2.0    FACTUAL BACKGROUND

While nominally a simple copyright case, there is significant relevant factual background needed to provide context around RRT's actions.

### 2.1.    The Plymouth Brethren Christian Church

The Plymouth Brethren Christian Church ("PBCC"), also known as the "Exclusive Brethren," is a wealthy cult with strong central control over its members' lives.  It abuses any who

---

[1] *Lenz v. Universal Music*, 815 F.3d 1145, 1155 (9th Cir. 2016) (Holding that willful blindness may be used to determine whether a copyright holder knowingly materially misrepresented that it held a good faith belief the offending activity was not a fair use) (cleaned up).

Cheryl Bawtinheimer's Motion for a Preliminary Injunction

seek to leave the cult. Despite its successful measures to lock down its members' personal lives, it has a shockingly high level of sexual abuse. Research presented in 2025 at the International Cultic Studies Association conference by Dr. Jill Aebi-Mytton found that 41% of former Exclusive Brethren participants reported childhood sexual abuse, most often perpetrated within the organization.[2] An organization that manages to keep its members from using the Internet cannot apparently control them from sexually abusing children.

Members who leave the Exclusive Brethren, whether voluntarily or through excommunication, do not just lose their religion. They are shunned and regarded as dead by spouses, parents, children, and friends. The cult's rules dictate that its members can only be employed by other members or cult-run businesses, so they frequently lose their jobs too. *See* ECF No. 26-1, Craig Hoyle, "Leaving the Exclusive Brethren: 10 years on," STUFF (Feb. 8, 2020); ECF No. 26-2, Ruth Hill, "Former Exclusive Brethren Church member providing support for others leaving," STUFF (Mar. 29, 2023). Given the fact that members are kept inside a sealed bubble, those who escape or are cast out are ill equipped to deal with the outside world. The trauma from their time inside the PBCC, coupled with a removal of all support, leads to high levels of mental anguish and PTSD as they struggle to survive. LGBTQ+ people born into this community are treated as if their existence is an abhorrent sin, and some have been compelled to undergo chemical castration in an attempt to "cure" them. When this inevitably fails, they are cast out without mercy. *See* ECF No. 26-3, Michael Bachelard, "Liberal donors the Exclusive Brethren deny being anti-gay. Here's proof they are," THE SYDNEY MORNING HERALD (June 20, 2016); ECF No. 26-4, Briana Fiore, "Ex-Brethrens on breaking free," ABC (Nov. 18, 2024).

---

[2] *See* International Cultic Studies Association (ICSA), "Child Sexual Abuse in Closed Religious Communities: Findings From a Large-Scale Quantitative Study," YOUTUBE (Oct. 31, 2025), available at: https://www.youtube.com/watch?v=OZ_g8-0j_M4.

Some of those who left have spoken out. From the 1970s to the present day, a series of former members set up websites or spoke to journalists about the abuse they suffered. Each has been attacked with heavy-handed SLAPP tactics, intrusive surveillance, and abusive searches of homes and electronics. *See* ECF No. 26-5, Nicky Hager, *We had vehicles outside the house: Exclusive Brethren used Thompson and Clark to spy on ex-members*, RADIO NEW ZEALAND (Apr. 20, 2021); ECF No. 26-6, Bevan Hurley, *Former Exclusive Brethren members hit with dawn raids, legal suits after speaking out against the secretive Christian sect*, STUFF (Aug. 9, 2020); ECF No. 26-7, Louise Milligan, et al., "*These Plymouth Brethren members stepped out of line, then the threats and intimidation started*," ABC (Sept. 15, 2025).

While Bawtinheimer was a child in the PBCC, she was sexually abused by an Exclusive Brethren/PBCC elder. ECF No. 26-8, Declaration of Cheryl Bawtinheimer ("Bawtinheimer Dec."), at ¶¶ 4-5. After leaving the cult, she started the Get-a-Life Podcast ("GAL") on YouTube with other former members. *Id*. at ¶ 6. The podcast's purpose is to show solidarity with other former PBCC members, to create a community to support those who leave, and to warn the public about the cult. It is devoted to revealing hypocrisy in the cult and sharing stories about members who suffered trauma at the PBCC's hands. *Id*. at ¶¶ 7-8. Most of the episodes are interviews with former members, exposing abuse and corruption in the Exclusive Brethren.

Some of these stories have been taken up by mainstream media. *See* ECF No. 26-9, C.S. Hagen, *Whistleblowers allege church with ND ties is replacing religion with riches*, INFORUM (Aug. 13, 2024); ECF No. 26-10, Pippa Bailey, *Escaping Eden: For those who leave the Exclusive Brethren sect, separation comes at great personal cost*, THE NEW STATESMAN (Aug. 23, 2023); ECF No. 26-11, Cherise Seucharan and Jesse Brown, *Plymouth Brethren Christian Church members under RCMP investigation for alleged sexual abuse in Saskatchewan*, CANADALAND (Nov. 7, 2022). A number of documentaries and high-profile newspaper articles have been

published that originate from the Get a Life podcast. *See* International Cultic Studies Association (ICSA), *It's Our Turn to Speak – How an Apostates' Podcast Is Changing Lives – and the PBCC Are Listening*, YOUTUBE (Oct. 31, 2025);[3] ECF No. 26-12, Rory MacLean, *Sask. RCMP not investigating historic rape case involving church elder, woman says*, CTV NEWS (May 30, 2023); ABC News In-depth, *Escaping the religious 'cult' tied to big business | Four Corners Documentary*, YOUTUBE (Sept. 15, 2025);[4] RATFUCKER PODCAST SERIES, *Chapter Two: The Brethren*,[5] CANADALAND (Nov. 7, 2022).[6]

The PBCC's character came to the attention of the UK's charity regulator and it concluded that the PBCC's Preston Down Trust was harmful to society. ECF No. 26-13, James Gray, *Christian group makes legal appeal for charity status*, THE GUARDIAN (Jan. 3, 2013); ECF No. 26-14, Decision of the Charity Commission regarding Preston Down Trust (Jan. 3, 2014). They cancelled its tax-free charity privileges. *Id*. This is not surprising, given that its leader advised people who left the cult to kill themselves by ingesting rat poison or arsenic. ECF No. 26-24, Billy Kenber, *Defectors may as well commit suicide, says leader of sect*, THE TIMES (Sept. 18, 2015).

In order to regain a tax-exempt vehicle, the Exclusive Brethren created the "Rapid Relief Team," a public-facing charity whose operations are designed to gain maximum press coverage by setting up brightly branded red tents at disaster sites, where conspicuously uniformed volunteers distribute supplies. The RRT functions as the PR wing of the PBCC in an attempt to counter and bury the darker truths. Get a Life Podcast, "Get A Life Ep. 139 *The Truth About Rapid Relief Team (RRT)*," YOUTUBE (June 22, 2025).[7]

---

[3] Available at: https://www.youtube.com/watch?v=urpi6O_aVno.
[4] Available at: https://www.youtube.com/watch?v=lFEIJr5rln4.
[5] Bawtinheimer's maiden name is Cheryl Hope. Some of the news coverage and documentaries discussing her experience with the PBCC refer to her as Cheryl Hope.
[6] Available at: https://www.canadaland.com/shows/ratfucker/.
[7] Available at: https://www.youtube.com/watch?v=cUIXSs8UGeY.

## 2.2. The DMCA Requests and Bawtinheimer's Videos

RRT claims ownership of a clip art bird (ECF No. 7-1) (the "RRT Logo"), which RRT claims was created as a "mascot" for RRT. The clip art bird here is not even the same logo (although it is similar) that appears in most of the videos that RRT took down. However, assuming arguendo that it was the same logo, or assuming arguendo that its derivatives are covered by the unregistered rights that RRT claims, the use in each and every video is obviously fair use.  Not just obvious to the trained eye. Obvious to anyone who is capable of conceptualizing fair use, even in the abstract, with no prior knowledge of Section 107 of the Copyright Act.  Obvious to *anyone*.



On or about October 28, 2025, Counterclaim-Defendant Church sent a DMCA takedown request targeting the GAL video posted on YouTube titled "*Lindy expresses her concern regarding the Plymouth Brethren Christian Church's RRT charity*" (the "First DMCA Request"). ECF No. 26-15. This request claims that the GAL video infringed the RRT Logo. (ECF No. 7 at ¶ 20). The fair use is evident just by looking at the image that RRT put in its own First Amended Complaint, since even the title makes it clear what this is – criticism and commentary about statements made on the RRT website. It is rare that a plaintiff in a copyright case includes exhibits or illustrations that make it so plain to see the fair use, but here we are, as this and all of the other images in this section are pulled right from the Amended Complaint (ECF No. 7). If we *watch* the videos, it becomes even clearer.  But the Court does not need to watch the videos (although it should for the sake of completeness) to come to the conclusion that this could be nothing other than fair use.

Obviously, the video at issue in the First DMCA Request criticizes RRT and notes its connection to the Exclusive Brethren/PBCC. The video specifically discusses how people find RRT's "branding and promotional material" to be disturbing. The complained-of image in this video is a display of RRT's website including the text "Compassion in action – supporting communities in need," which appears at 0:52-1:07 of the video. The image appears for 15 seconds out of the five-minute video. This video discusses how this text is ironic coming from RRT, given that RRT and PBCC are in no way compassionate, nor do they support communities in need. Of note is that the video does not feature Bawtinheimer at all; rather, it exclusively features a third party discussing RRT and the Exclusive Brethren/PBCC.

On or about October 28, 2025, Counterclaim-Defendant Church sent an equally abusive DMCA takedown request targeting the GAL video posted on YouTube titled "*Rapid Relief Team: Hypocrisy & Families Divided at Christmas*" (the "Second DMCA Request"). ECF No. 26-16. This request claims that the GAL video infringed the RRT Logo by displaying the following  image (ECF No. 7 at ¶ 22). Again, one needs to go no further than the title to see that this is fair use.  The video at issue in the Second DMCA Request criticizes RRT and how the PBCC divides families at Christmas, while their website says that they are bringing members together for the holiday season. The complained-of image in this video displays RRT's promotional message "Bringing families together for the Holiday Season," which appears at 0:18-0:35 of the video. The

image appears for 17 seconds out of the three and a half minute video. This video discusses how this promotional material is hypocritical to people familiar with RRT and the Exclusive Brethren/PBCC, as the cult actively works to separate families if any of them dissent from the cult's teachings. As with the first video, this video features a third party discussing RRT and the Exclusive Brethren/PBCC.

Bawtinheimer sent DMCA counter-notices to YouTube regarding the First and Second DMCA Requests, and YouTube reinstated the videos, finding that they did not infringe on RRT's copyright. ECF Nos. 26-17 – 26-18. Counterclaim-Defendants were not done, though. On or about January 10, 2026, Counterclaim-Defendant Church sent another DMCA takedown request once again requesting removal of the same videos at issue in the First and Second DMCA Requests (the "Third DMCA Request"). The purpose of this request was to exploit YouTube's policies, which state that YouTube may re-remove a video that is subject to pending litigation. ECF No. 26-19, YouTube Counter-notice policies.

When Church's abusive practices on behalf of RRT did not seem to do the job, they rolled out the big guns.  On or about January 28, Counterclaim-Defendant Michael Graif targeted the GAL video posted on YouTube titled "*Get A Life Ep. 144 Rapid Relief Team's Branded Trauma: Ex-members Speak Out*" (the "Fourth DMCA Request"). ECF No. 26-20. He claimed that the GAL video infringed the RRT Logo by displaying the same image as in the video at issue in the First DMCA Request (ECF No. 7 at ¶¶ 24 & 26). As is evident from its title, the video at issue in the Fourth DMCA Request criticizes RRT and notes its connection to the Exclusive Brethren/PBCC. The complained-of images in this video consist of the images complained of in the First and Second DMCA Requests,[8] as well as: (1) an image incorporating the RRT Logo and the RRT

---

[8] These are displayed at time stamps 00:01:07-00:01:38, 01:19:15-01:22:53, 01:39:47-01:40:02, and 01:53:13-01:53:32 of the video.

website's "Community, Compassion, Support" language (displayed at 00:03:43-00:04:07, 01:36:56-01:37:13 and 01:37:50-01:37:59); (2) a photo of RRT "relief" tents and trailer with the RRT Logo shown (displayed at 00:04:16-00:05:11); (3) a photo of an RRT van bearing the RRT Logo and the text "Breaking the silence on suicide" and "Construction, Community, Connect" (displayed at 00:19:46-00:21:34 and 01:58:37-01:58:56); and (4) another image from RRT's website that displays a variation of the RRT Logo holding an RRT food box (displayed at 00:33:22-00:35:08). Taken together, the RRT Logo or variations of it are displayed only while there is commentary about the website and statements thereupon where the logo is above the statements.

This video is a discussion between Bawtinheimer and two other Exclusive Brethren/PBCC survivors in which they criticize RRT and the PBCC, including discussing how RRT's promotional material featuring the RRT Logo is hypocritical given how poorly it treats its members and its former members. They note that RRT performatively claims to help the needy while providing crumbs to them, and spends most of its resources on self-promotion. The video also incorporates the videos complained of in the First, Second, and Third DMCA Requests in their entirety.

On or about January 28, 2026, Counterclaim-Defendant Graif sent a DMCA takedown request targeting the GAL video posted on YouTube titled "Plymouth Brethren Christian Church: Former Member Exposes Rapid Relief Team" (the "Fifth DMCA Request"). ECF No. 7 at ¶ 31. While the title was different, this was the same video as complained of in the First DMCA Request; Graif re-issued a takedown request on a video that YouTube had already found was not infringing.

On or about January 28, Counterclaim-Defendant Graif sent a DMCA takedown request targeting the GAL video posted on YouTube titled "Chapter 2 part 1 Rapid Relief Team- Why disaster relief?" (the "Sixth DMCA Request"). ECF No. 26-21. This request claims that the GAL video infringed the RRT Logo by displaying the following image (ECF No. 7 at ¶ 33).

The allegedly infringing image from the video is no more than a screenshot of RRT's own website displaying the RRT Logo with the text "Compassion in action – supporting communities in need." It is displayed in the video for approximately 6 seconds (from 05:20-05:26) of the 10-minute video while there is commentary about the message on the website. The video at issue in



the Sixth DMCA Request discusses how RRT is focused on disaster relief as a method of providing highly visible "charity" to rehabilitate the PBCC's public image.

On January 30, Counterclaim-Defendant Graif sent a DMCA takedown targeting the GAL video "Get A Life Ep. 145 Rapid Relief Team: Where's the compassion?- With guest Damian Hastie" (the "Seventh DMCA Request"). ECF No. 26-22.[9] It claimed that the video infringed the RRT Logo by displaying this image (ECF No. 7 at ¶¶ 28-29):

As is evident from its title, the video at issue in the Seventh DMCA Request criticizes RRT and notes its connection to the PBCC. The complained-of image in this video is a mockup of a variation of the RRT website accompanied by the text "Compassion in action – supporting



---

[9] Notices from YouTube to Bawtinheimer for each of the DMCA Requests is attached as **Composite Exhibit 1**.

communities in need," next to an image summarizing the speakers' criticisms of RRT. "Front group," "Tax scheme, "Deception," "Cult."  This image is displayed for approximately 12 seconds (from 01:39:12-01:39:24) of the 101-minute video. This video discusses how RRT's slogans are disingenuous, as RRT largely serves only to enrich itself and the PBCC, that RRT primarily exists to "charity wash" PBCC by making the public focus on RRT's alleged charitable activities instead of PBCC's misconduct, and that PBCC is operated more like a business than a religion.

Counter-Defendants Church, Graif, and Brown Rudnick, at the behest and/or specific instruction of RRT, sent the above DMCA Requests for the purpose of censoring Bawtinheimer's criticism, and not to redress copyright infringement.  And this is not a one-off newfound desire to abuse the courts to censor critics.  This is PBCC's modus operandi.

In 2009, the PBCC filed a SLAPP including a claim of copyright infringement against the operator of a website that offered "an online sanctuary" for people to escape the cult. ECF No. 26-25, Andy Bromage, "Might v. Site: Will a New Vermont law protect a Williston couple from a powerful religious sect?," SEVEN DAYS (Nov. 4, 2009). The same publishing arm filed suit for defamation and copyright infringement years earlier in Minnesota against the operator of a different criticism website. *Bible & Gospel Trust v. Wyman*, 354 F. Supp. 2d 1025 (D. Minn. 2005). That case eventually resulted in a settlement, which required the operator to transfer his criticism websites to the Exclusive Brethren and agree never again to publish about the cult. ECF No. 26-26, Settlement Agreement in *Wyman*, No. 0:04-cv-00700-MJD-JGL (D. Minn.), Dkt. No. 71 at 4. In 2017, the PBCC sued major Australian media outlets and journalist Michael Bachelard for defamation following investigative articles alleging institutional cover-ups of child sexual abuse within the church. The defendants successfully dismissed the lawsuit, which dismissal was upheld on appeal. ECF No. 26-27, *Plymouth Brethren (Exclusive Brethren) Christian Church v. The Age Company Ltd.* [2018] NSWCA 95 (7 May 2018). Around the same time, the PBCC's publishing

arm sued a retired Scottish academic for copyright infringement after he published short extracts and quotes from the cult's internal sermons and teachings as part of criticism about the cult. ECF No. 26-28, Billy Kenber, "Exclusive Brethren 'cult' sues over publication of sermons," THE TIMES (Jan. 23, 2019). And in 2020 in New Zealand, a company closely linked to the PBCC obtained a civil search and seizure order that led to a pre-dawn raid on an ex-PBCC member's home seeking seizure of electronic devices and documents after the ex-member publicly criticized the cult. *See* ECF No. 26-6. This was an obvious intimidation tactic, as the company later dropped its underlying legal claims. *Id*.

In this latest round of "stifle criticism," the censorship has been successful so far because Counter-Defendants successfully gamed the system. In response to each of the above DMCA requests, YouTube disabled access to each of the critical videos. Bawtinheimer Decl. at ¶ 16. Removal of these videos caused Bawtinheimer monetary harm. While the monetization was minimal, in the tens of dollars, she still suffered economic loss. *Id*. at ¶ 17. But the few dollars she might have earned are not the *irreparable* harm here. The *irreparable* harm is the inability to spread public awareness of RRT and its activities. Right now, there are potential escapees from PBCC, or those who have been cast out, who have once again lost the ability to find help – just like when PBCC destroyed such online communities in the past. If Bawtinheimer were to re-upload them, it is clear that RRT and its counsel would simply issue another copyright strike, since they've done so even during the pendency of this litigation. YouTube would not reinstate the videos due to the existence of this lawsuit. *Id*. at ¶ 18. Due to RRT's tactics of censorship as shown by its history, this lawsuit, and the numerous bad-faith DMCA takedown requests, Bawtinheimer also fears that any future videos regarding RRT will be subjected to more bad faith censorship. *Id*. at ¶ 19. Too many copyright strikes on her YouTube channel will result in the channel being disabled entirely, which would be devastating to her ability to report on RRT and the PBCC. *Id*.

- 12 -
Cheryl Bawtinheimer's Motion for a Preliminary Injunction

**3.0    LEGAL STANDARD**

A preliminary injunction should enter if a plaintiff establishes: (1) a likelihood of success on the merits; (2) irreparable harm; (3) equities in her favor; and (4) no disservice to the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). "[A] stronger showing of one element may offset a weaker showing of another." *Id*. at 1131-35.

Courts regularly order retraction of takedown notices as preliminary relief. *See, e.g., Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*, 790 F. Supp. 2d 1024, 1026 (N.D. Cal. 2011) (noting that the court had previously "issued a preliminary injunction requiring [defendant] to withdraw all DMCA Takedown Notifications"); *Design Furnishings, Inc. v. Zen Path, LLC*, 2010 U.S. Dist. LEXIS 135819, *31 (E.D. Cal. Dec. 23, 2010) (granting preliminary injunction barring defendant from issuing additional takedown notices). Bawtinheimer is entitled to a preliminary injunction ordering RRT to withdraw its DMCA Requests because she can show that the "law and facts clearly favor [her] position, not simply that [she] is likely to succeed." *Garcia v. Google*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). The Court should restore the status quo ante by requiring RRT to withdraw its DMCA Requests.

**4.0    ARGUMENT**

All four preliminary injunction factors weigh in Bawtinheimer's favor. The Court should not permit Counter-Defendants to enjoy their ill-gotten prior restraint they enjoy right now.

**4.1.    Bawtinheimer Has a Likelihood of Success on Her Claims**

Bawtinheimer asserts: (1) violation of 17 U.S.C. § 512(f); and (2) declaratory judgment. She will prevail on both. Her uses of the RRT Logo were fair uses, such that it was impossible for Counterclaim-Defendants to have formed a good-faith belief that Bawtinheimer infringed.

//

//

- 13 -
Cheryl Bawtinheimer's Motion for a Preliminary Injunction

### 4.1.1    Bawtinheimer Clearly Did Not Infringe RRT's Copyright

RRT started this fight because it doesn't want to be criticized, and this is a harm that the Copyright Act is not here to address. "[A] weak copyright claim cannot justify censorship in the guise of authorship." *Garcia*, 786 F.3d at 736. "[T]he fair use of a copyrighted work … for purposes such as criticism, comment, [or] news reporting… is not an infringement of copyright." 17 U.S.C. § 107. "The fair use doctrine thus 'permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.'" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) (alteration in original) (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)).  All fair use factors are either neutral or favor Bawtinheimer.

### 4.1.2    Factor One:  Purpose and Character of the Use

The first fair use factor "requires an analysis of the specific 'use' of a copyrighted work that is alleged to be 'an infringement.'" *Andy Warhol Fdn. v. Goldsmith*, 598 U.S. 508, 511 (2023) (citing 17 U.S.C. § 107). "The central question it asks is whether the new work merely supersedes the objects of the original creation ('supplanting' the original), or instead adds something new, with a further purpose or different character." *Id*. at 509. A use that has a different purpose or character from the original is said to be transformative, and the more transformative a use is, the less significant the other factors will be. *Campbell v. Acuff-Rose*, 510 U.S. 569, 579 (1994). Criticism "ordinarily does not supersede the objects of, or supplant, the work. Rather, it uses the work to serve a distinct end." *Goldsmith*, 598 U.S. at 528.

When a logo identifies a company, it is per se fair to use that logo nominatively to identify the company, especially when criticizing it.  The uses were not even of *just* the logo (although that would not change the analysis), but specifically the logo as it appeared on RRT's website containing promotional material published by RRT, where the commenters were criticizing the

organization based on that very promotional material. ECF Nos. 26-15 – 26-16; 26-20 – 26-22. The Court should review the videos in their entirety (*id.*), but even the screen captures that RRT itself selected show that this is criticism and commentary, and thus a fair use. *See* ECF No. 7 at ¶¶ 20, 22, 24, 28, 31, & 33. In a case that is directly applicable, the Fourth Circuit found  it was transformative to use the Baltimore Ravens logo to identify the team while discussing the team in a historical context. *Bouchat v. Baltimore Ravens*, 737 F.3d 932, 941 (4th Cir. 2013) (transformative because use of Baltimore Ravens' logo was to "tell new stories and not simply rehash the seasons").

Bawtinheimer's use is identically transformative.  She did not use the logo for its artistry. *In re DMCA § 512(H) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868, 879-880 (N.D. Cal. 2022). She was using it to identify RRT in a video criticizing RRT and the statements RRT published along with the logo. "[A]n allegedly infringing work is typically viewed as transformative as long as new expressive content or message is apparent." *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1177 (9th Cir. 2013).  While Bawtinheimer's use was not commercial,[10] "[e]ven assuming that the use had a purely commercial purpose, the presumption of unfairness can be rebutted by the characteristics of the use." *Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1152-53 (9th Cir. 1986) (reprinting copyrighted material to criticize was fair use).

---

[10] RRT may try to claim that monetization makes the videos "commercial."  This is a bad faith argument.  Even the speech at issue in *New York Times v. Sullivan*, despite being a paid advertisement, was not "commercial speech." 376 U.S. 254, 266 (1964).  Commercial speech is "speech that does no more than propose a commercial transaction." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001).  *See also Tobinick v. Novella*, 848 F.3d 935, 952 (11th Cir. 2017) (rejecting the argument that compensation turns speech into commercial speech, relying on *Burstyn v. Wilson*, 343 U.S. 495, 501 (1952) and *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1186 (9th Cir. 2001)).  Otherwise, only free pamphlets with no advertising would be eligible for fair use protection.  In *Campbell*, the Court clarified that even if a defendant's use is commercial, any presumption of market harm for commercial uses only applies where the use of the work is not transformative. *Campbell*, 510 U.S. at 591.

If one were trying to make a bad faith desperate argument, one might argue that Bawtinheimer's videos criticize RRT itself, rather than the RRT Logo specifically, and thus her use is not transformative. That is the only remotely hypothetical argument that can be imagined here, but courts have repeatedly found that using a copyrighted photo of a person when criticizing that person (rather than critiquing the photo itself) is a fair use. *See Dhillon v. Doe*, 2014 U.S. Dist. LEXIS 24676, *14-15 (N.D. Cal. Feb. 25, 2014) (use of plaintiff's copyrighted headshot for an article criticizing plaintiff's views was "paradigmatic fair use" and was "transformative because it served the purpose of criticism, rather than identification"); *Hannley v. Mann*, 2023 U.S. Dist. LEXIS 40022, *13-14 (C.D. Cal. Mar. 8, 2023) (using plaintiff's copyrighted photo on website and social media accounts to criticize plaintiff by identifying plaintiff's bankruptcies and claiming that he "Loves Ripping Old Men Off" was transformative "because they were used for negative criticism, and not identification and positive development of Edalat's internet presence"); *Katz v. Chevaldina*, 2014 U.S. Dist. LEXIS 88085, *18-19 (S.D. Fla. June 17, 2014) (finding fair use where defendant cropped plaintiff's copyrighted photo into unflattering images with critical captions was fair use because it was used to criticize Katz). The logo here identifies RRT just as a photo identifies a person. (ECF No. 7 at ¶¶ 4, 12).

### 4.1.3   Factor Two: The Nature of the Copyrighted Work

The nature of the work favors fair use. The Plaintiff admits the logo was created to identify the organization. (ECF No. 7 at ¶ 4, 12). This makes it more of a "functional work" than a creative work. *Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 803 (9th Cir. 2003) ("creative works are 'closer to the core of intended copyright protection' than informational and functional works"). Courts have found that images used to identify a person or entity are more informational than creative. *Dhillon*, 2014 U.S. Dist. LEXIS 24676 at *15 (photo's purpose was to identify plaintiff,

thus the photo "was intended to be more informational than creative.") This factor thus favors Bawtinheimer or, at worst, is neutral.

### 4.1.4   Factor Three: Amount and Substantiality

Under the third factor, while Bawtinheimer used the entirety of the logo (or a derivative of it) that doesn't tilt this factor in RRT's favor.  Use of an entire work can still be fair. *See Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1118 (9th Cir. 2000). Again, *Bouchat* is on point.  *Bouchat*, 737 F.3d at 943 ("Though the NFL has used Bouchat's work in its entirety, the transformativeness of the use and the character of Bouchat's work lead us to give very little weight to this factor. It would be senseless to permit the NFL to use the Flying B logo for factual, historical purposes, but permit it to show only a half, or two-thirds of it").

One must by necessity use the entire RRT logo to criticize RRT.  If that were not the case, all a company would need to do in order to ensure that it cannot be criticized would be to use its logo on everything it produces. If one cannot use an entire logo to criticize an organization, then no newspaper could criticize the Republicans nor the Democrats by using their elephant or donkey. Protesters who dislike Elon Musk won't be able to hold signs with the Tesla logo on them without paying Elon a royalty. Donald Trump himself has a designed coat of arms; one could not use that to criticize the sitting President if RRT's theory has a shred of power. This factor is neutral.

### 4.1.5   Factor Four: Effect on the Market for the Original

This factor considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). In evaluating this factor, courts consider "whether the infringing use: (1) tends to diminish or prejudice the potential sale of the work . . .; (2) tends to interfere with the marketability of the work; or (3) fulfills the demand for the original work." *Hustler Magazine*, 796 F.2d at 1155-56 (cleaned up). "We ask not whether the second work would damage the market for the first (by, for example, devaluing it through parody or criticism), but

- 17 -
Cheryl Bawtinheimer's Motion for a Preliminary Injunction

whether it usurps the market for the first by offering a competing substitute." *Hachette Book Grp. v. Internet Archive*, 115 F.4th 163, 189 (2d Cir. 2024).

The effect on the market for the original is zero. Bawtinheimer's use might harm RRT "by force of its criticism, rather than by supplying the demands of the market [but that] does not create a cognizable harm under the Copyright Act." *Savage v. Council on Am.-Islamic Rels., Inc.*, 2008 U.S. Dist. LEXIS 60545, at *22 (N.D. Cal. July 25, 2008). Any potential claims on the market impact of derivative works are barred as a matter of law because "there is no protectible derivative market for criticism" and impairing such a market by the effectiveness of critical commentary is not relevant under copyright law. *Id*. at *23 n.2 (quoting *Campbell*, 510 U.S. at 592-93).

RRT admits that the logo is a source identifier for RRT. This is more akin to a trademark issue than a copyright one, but even if it had been pled as one, this would be subject to the doctrine of *nominative fair use* (and using the DMCA for trademark claims is bad faith, so Bawtinheimer still wins). The "market harm" that RRT asserts is just complaining that it doesn't like *criticism*, a harm that the Copyright Act cannot, and was never intended to, remedy. "[A] weak copyright claim cannot justify censorship in the guise of authorship." *Garcia*, 786 F.3d at 736. To criticize a party without showing their statements and provenance of their statements would not only make the criticism less reliable, but would be unfair to a plaintiff. *See, e.g., Savage v. Council on Am.-Islamic Rels., Inc.*, 2008 U.S. Dist. LEXIS 60545, *15 (N.D. Cal. July 25, 2008); *Bollea v. Gawker Media, LLC*, 913 F. Supp. 2d 1325, 1327 (M.D. Fla. 2012) (copyright cannot be used to remedy privacy rights). This factor weighs in Bawtinheimer's favor. All the fair use factors are either neutral or favor Bawtinheimer. She is quite likely to prevail on her claim for declaratory judgment.

### 4.1.6    Counterclaim-Defendants Clearly Violated 17 U.S.C. § 512(f)

A claim for violation of 17 U.S.C. § 512(f) has three elements: "(1) the defendant 'knowingly and materially misrepresent[ed]' that copyright infringement occurred; (2) a service

provider 'remov[ed] or disable[d] access to the material claimed to be infringing,' and (3) that the plaintiff has been 'injured' as a result." *Invisible Narratives v. Next Level Apps Tec.-FZCO*, No. 25-cv-01644-NW, 2025 U.S. Dist. LEXIS 29888, *8-9 (N.D. Cal. Feb. 19, 2025) (quoting 17 U.S.C. § 512(f)).

Pursuant to "[17 U.S.C.] § 512(f) of the DMCA, a copyright owner may be held liable for damages caused by an erroneous invocation of the notice and takedown provision only if the owner did not possess a subjective good faith belief that its copyright was being infringed." *UMG Recordings, Inc. v. Augusto*, 558 F. Supp. 2d 1055, 1065 (C.D. Cal. 2008), *aff'd*, 628 F.3d 1175 (9th Cir. 2011). Liability for money damages and attorneys' fees under this section extends to "[a]ny person who knowingly materially misrepresents under this section . . . that material activity is infringing." 17 U.S.C. § 512(f). While this is a high bar, it is hardly unattainable even at the preliminary injunction stage. *See Hollister v. Sims*, 2026 U.S. Dist. LEXIS 47709, *8-9 (C.D. Cal. Jan. 30, 2026) (finding likelihood of success on § 512(f) claim where record suggested copyright claimant had actual knowledge of lack of ownership of allegedly infringed work).

Attorneys should be charged with some degree of constructive knowledge of fair use, even if laypeople deserve more latitude. Counter-Defendants Brown & Rudnick, Church, and Graif could not possibly have been unaware that their DMCA Requests were bad faith. Brown & Rudnick served as plaintiff's counsel in a case brought under 17 U.S.C. § 512(f) just over a year ago. *See Channel 781 News v. Waltham Community Access Corp.,* 761 F. Supp. 3d 371, 372 (D. Mass. 2025). In that case, they represented a party that was victim to ill-considered DMCA takedown notices who filed suit against the alleged copyright owner. However, at least the party who sent the DMCA takedowns was trying to protect their monopoly on certain footage, and not trying to censor a critic. The takedowns were a bad idea and failed to consider fair use, but at least they were not knowingly abusive like in this case. Here, Brown & Rudnick's attorneys certainly

Cheryl Bawtinheimer's Motion for a Preliminary Injunction

had access to that knowledge.  But even without that case in their firm servers, these particular lawyers tout themselves as experts in the field. *See* Brown & Rudnick profile for Michael Graif, attached as **Exhibit 2**[11] (advertising Graif as having decades of experience in intellectual property practice, with a focus on various practice areas including copyright enforcement and fair use). Actual knowledge of copyright law and fair use should have merged with good ethics and resulted in them telling RRT "no."  Instead, they used that knowledge to try and game the system.

There is no plausible excuse for a sophisticated plaintiff like RTT, whose various affiliated entities have been suing critics for copyright infringement for decades, not to be aware that Bawtinheimer's use of the RTT Logo in her videos was a fair use. There is equally no possibility its attorneys who sent the DMCA Requests were not aware that Bawtinheimer's uses were fair uses. Any reasonable person, and certainly any reasonably competent attorney, would be able to tell at a glance that these videos did not infringe RRT's copyright, yet Counterclaim-Defendants sent the DMCA Requests all the same. Accordingly, Counterclaim-Defendants cannot avoid § 512(f) liability merely because they "pay[] lip service to the consideration of fair use by claiming [they] formed a good faith belief when there is evidence to the contrary" *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1154-55 (9th Cir. 2016).  Even if that evidence is circumstantial, the overwhelming circumstantial evidence here is inescapable.

The only plausible explanation is that Counterclaim-Defendants chose to falsely represent that they had a good-faith belief her uses were not authorized by the law. The obvious motivation was to silence a critic of their wealthy client. In response to the requests, YouTube removed several of Bawtinheimer's videos. Bawtinheimer Decl. at ¶ 16. Bawtinheimer suffered damages both in terms of lost income and her inability to carry on her work of informing the public about RRT and

[11] Available at: https://brownrudnick.com/people/michael-r-graif/.

the PBCC. *Id*. at ¶¶ 17-19 Counterclaim-Defendants thus issued bad-faith DMCA takedown requests in violation of § 512(f). Bawtinheimer will succeed on this claim.

### 4.2.     Bawtinheimer Will Suffer Irreparable Harm Without the Injunction

If RRT sought an injunction to take down the videos, it would never prevail. But it obtained a *de facto* prior restraint injunction by sending bad-faith DMCA Requests. RRT's only harm, if it had any hope of proving copyright infringement, would be monetary damages, which is insufficient to prove irreparable harm. *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005). Conversely, Bawtinheimer's intangible injuries like reputational harm, loss of online following, stifling of her speech rights, impairment of her right to associate with and help others, and account termination, constitute irreparable harm. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 838 (9th Cir. 2001) (injunctive relief affirmed to restore *status quo ante* to allow "the immediate release of its goods to avoid irreparable harm stemming from lost contracts and customers, and harm to its business reputation and goodwill"). "When the status quo is one of business activity and the alternative of 'rest' causes irreparable harm, we have favored the activity." *Hill v. Xyquad, Inc.*, 939 F.2d 627, 631 (8th Cir. 1991). Furthermore, courts have found that the likelihood of a defendant continuing to send bad-faith DMCA notices, with the likely result of disabling a plaintiff's YouTube channel or restricting content on the channel, demonstrates irreparable harm. *Invisible Narratives*, 2025 U.S. Dist. LEXIS 29888 at *10.

Removal of Bawtinheimer's videos limited her ability to spread public awareness of RRT and its activities and to foster support for a community of outcasts. Bawtinheimer Decl. at ¶ 18. Counterclaim-Defendants' actions stifled information available about RRT and the PBCC, and if Bawtinheimer were to re-upload the videos without a preliminary injunction, Counterclaim-Defendants would simply issue more copyright strikes, causing further removals. *Id*.  She cannot re-upload them anyway, if they are subject to a sustained copyright strike.  Bawtinheimer has a

reasonable fear that Counterclaim-Defendants will continue to do this for *any* video she posts about RRT or the PBCC, regardless of whether there is any good-faith basis for claiming such videos constitute copyright infringement. Further strikes will result in having her YouTube channel disabled entirely, which would be disastrous to her mission of informing the public about RRT and the PBCC's misdeeds. *Id*. at ¶ 19.

### 4.3. The Remaining Preliminary Injunction Factors Favor Bawtinheimer

Bawtinheimer will suffer irreparable harm absent the requested preliminary injunction, which is modest: tell the Counterclaim-Defendants to back off, knock it off, and retract. Meanwhile, none of them would suffer any cognizable harm. Bawtinheimer is not infringing RRT's copyrights, meaning the only conceivable harm that RRT would suffer would be having to be criticized. Cases dealing with similar intellectual property takedown systems have found that it is in the public interest to enjoin such abuses and require the withdrawal of invalid takedown requests. *See Beyond Blond Prods. v. Heldman*, 479 F. Supp. 3d 874, 888 (C.D. Cal. 2020) (preliminary injunction requiring withdrawal of DMCA notices was in the public interest).

### 4.4. The Court Should Require, at Most, a Nominal Bond

The court may dispense with a bond when there is no realistic likelihood of harm to the defendant from an injunction. *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). Issuing a no bond injunction is appropriate in § 512(f) cases, as an injunction has no tendency to harm the defendant. *Heldman*, 479 F. Supp. 3d at 889 (entering preliminary injunction in similar action without a bond). RRT will not suffer any harm as a result of the injunction, as it will merely restore the status quo by undoing the *de facto* injunction they obtained by abusing the DMCA takedown process. If the Court wishes to require a bond, it should be a nominal $100 bond.

//

//

RANDAZZA | LEGAL GROUP

**5.0    CONCLUSION**

The Court should enter the preliminary injunction to put an end to RRT's abuse of the DMCA process, and to restore Ms. Bawtinheimer's rights, and should put up a barrier to further abusive conduct by RRT and its legal team.  The requested injunction is necessary and proper.

Dated: April 4, 2026.                              Respectfully submitted,

RANDAZZA LEGAL GROUP, PLLC          C.A. GOLDBERG, PLLC
/s/ Marc J. Randazza
Marc J. Randazza, SBN 269535               Carrie Goldberg (pro hac vice forthcoming)
Alex J. Shepard, SBN 295058                16 Court St, 33rd Floor
8991 W Flamingo Rd., Suite B               Brooklyn, NY 11241
Las Vegas, NV 89147

*Attorneys for Defendant and Counterclaim-Plaintiff, Cheryl Bawtinheimer*

Case No. 4:25-cv-10864-JST

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 4, 2026, electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I further certify that a true and correct copy of the foregoing document is being served via transmission of Notices of Electronic Filing generated by CM/ECF.

Respectfully submitted,

/s/ Marc J. Randazza
Marc J. Randazza

- 24 -
Cheryl Bawtinheimer's Motion for a Preliminary Injunction