Marc J. Randazza, CA Bar No. 269535
Alex J. Shepard, CA Bar No. 295058
RANDAZZA LEGAL GROUP, PLLC
8991 W. Flamingo Rd., Ste. B
Las Vegas, Nevada 89147
Telephone: 702-420-2001
ecf@randazza.com

Carrie Goldberg (*pro hac vice* forthcoming)
C.A. GOLDBERG, PLLC
16 Court St, 33rd Floor
Brooklyn, NY 11241
Telephone: 646-666-8908
carrie@cagoldberglaw.com

*Attorneys for Defendant and Counterclaim-Plaintiff,*
*Cheryl Bawtinheimer*

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

Rapid Relief Team (RRT) Ltd.,

        Plaintiff and Counterclaim-
        Defendant,

    vs.

Cheryl Bawtinheimer,

        Defendant and Counterclaim-
        Plaintiff,

    vs.

Brown Rudnick LLP, Katy-Jade Church, and
Michael Graif,

        Counterclaim-Defendants.

Case No.: 4:25-cv-10864-JST
JUDGE: Hon. Jon S. Tigar

**DEFENDANT AND COUNTER
CLAIM-PLAINTIFF CHERYL
BAWTINHEIMER'S REPLY IN
SUPPORT OF MOTION FOR A
PRELIMINARY INJUNCTION**

RANDAZZA | LEGAL GROUP

**TABLE OF CONTENTS**

1.0    INTRODUCTION AND FACTUAL BACKGROUND ................................................ 1

   1.1    Welcome to America ....................................................................................... 1

   1.2    Factual Background ......................................................................................... 2

2.0    THE LEGAL AND FACTUAL ISSUES ON REPLY .......................................... 2

   2.1    YouTube's Copyright Policy and Its Effects .................................................. 2

   2.2    Injunctive Relief is Available Threefold ........................................................ 4

   2.3    Bawtinheimer is Likely to Prevail on Her Declaratory Judgment Claim ...... 5

      2.3.1    The Purpose and Character of the Use is Classic Fair Use ............... 5

      2.3.2    The Copyrighted Work is Informational ......................................... 7

      2.3.3    The Amount and Substantiality is Irrelevant in this Context ........... 8

      2.3.4    There is no Effect on the Market for the Original ........................... 8

   2.4    Bawtinheimer is Likely to Prevail on Her 512(f) Claim ................................ 8

   2.5    Bawtinheimer Has Shown Irreparable Harm ................................................ 10

   2.6    The Balance of Hardships Tips in Bawtinheimer's Favor .............................. 11

   2.7    The Injunction Will Serve the Public Interest ............................................... 12

   2.8    RRT's Concerns About a Mandatory Injunction are Fictional ...................... 13

   2.9    RRT's Timeliness Argument is Unfounded ................................................... 15

3.0    CONCLUSION ................................................................................................... 15

## TABLE OF AUTHORITIES

**CASES**

*Amaretto Ranch Breedables v. Ozimals, Inc.,*
   2010 U.S. Dist. LEXIS 141242 (N.D. Cal. 2010)...................................................... 11, 12

*Andy Warhol Found. For the Visual Arts, Inc. v. Goldsmith,*
   598 U.S. 508 (2023) .................................................................................................. 6

*Bouchat v. Baltimore Ravens,*
   737 F.3d 932 (4th Cir. 2013)..................................................................................... 8

*Campbell v. Acuff-Rose Music, Inc.,*
   510 U.S. 569 (1994) .................................................................................................. 7

*Dhillon v. Doe,*
   2014 U.S. Dist. LEXIS 24676 (N.D. Cal. 2014)..................................................... 6, 7

*Executive Lens LLC v. Rapkin,*
   2026 U.S. Dist. LEXIS 58448 (N.D. Cal. Mar. 19, 2026) ......................................... 10

*Garcia v. Google, Inc.,*
   786 F.3d 733 (9th Cir. 2015)..................................................................................... 13

*GoTo.com, Inc. v. Walt Disney Co.,*
   202 F.3d 1199 (9th Cir. 2000).................................................................................... 14

*Hannley v. Mann,*
   2023 U.S. Dist. LEXIS 40022 (C.D. Cal. 2023)........................................................ 6

*Hernandez v. Sessions,*
   872 F.3d 976 (9th Cir. 2017)..................................................................................... 14

*Hollister v. Sims,*
   2026 U.S. Dist. LEXIS 47709 (C.D. Cal. 2026)...................................................... 5, 12

*Hustler Magazine, Inc. v. Falwell,*
   485 U.S. 46 (1988) .................................................................................................... 4

*Independent. Living Ctr. of So. Cal., Inc. v. Maxwell–Jolly,*
   572 F.3d 644 (9th Cir. 2009)..................................................................................... 12

*Invisible Narratives v. Next Level Apps Tech.-FZCO,*
   2025 U.S. Dist. LEXIS 29888 (N.D. Cal. 2025)....................................................... 5, 12

*Johnson v. Kay,*
   860 F.2d 529 (2d Cir. 1988)....................................................................................... 14

RANDAZZA | LEGAL GROUP

*Katz v. Chevaldina,*
   2014 U.S. Dist. LEXIS 88085 (S.D. Fla.  2014) ........................................................ 6

*Lenz v. Universal Music Corp.,*
   815 F.3d 1145 (9th Cir. 2016) ..................................................................... 9, 10

*New York Times v. Sullivan,*
   376 US 254 (1964) ..................................................................................... 1, 4

*Online Pol'y Grp. v. Diebold, Inc.,*
   337 F. Supp. 2d 1195 (N.D. Cal. 2004) ............................................................ 8

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.,*
   944 F.2d 597 (9th Cir. 1991) ........................................................................ 11

*Rossi v. Motion Picture Ass'n of Am., Inc.,*
   391 F.3d 1000 (9th Cir. 2004) ....................................................................... 9

*Stardock Sys., Inc. v. Reiche,*
   2018 U.S. Dist. LEXIS 222971 (N.D. Cal. 2018) ....................................... 5, 12

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,*
   240 F.3d 832 (9th Cir. 2001) ........................................................................ 11

*Williams v. Lobel Fin. Corp.,*
   673 F. Supp. 3d 1101 (C.D. Cal. 2023) .......................................................... 11

*Youth 71Five Ministries v. Williams,*
   160 F.4th 964 (9th Cir. 2025) ........................................................................ 5

**STATUTES**

17 U.S.C. § 107 ................................................................................................... 1, 10

17 U.S.C. § 505 ......................................................................................................... 1

17 U.S.C. § 512 .................................................................................................. passim

**OTHER AUTHORITIES**

Laura Dyason & Bernard Doherty, *The Modern Hydra: The Exclusive Brethren's Online Critics: A Case Study of Cult Awareness Activism and Community Formation in Cyberspace*, 233 St. Mark's Rev. 116, 124 (2015) ................................................................................. 2

Laura Edelson, "Content Moderation in Practice," 3 J. Free Speech L. 183, 188 (2023) ............ 3

Marc J. Randazza, "*Lenz v. Universal*: A Call to Reform Section 512(f) of the DMCA and to Strengthen Fair Use," 18 Vanderbilt J. of Ent. And Tech. L. 743 (2020) ........................... 9

RANDAZZA | LEGAL GROUP

S. REP. NO. 105-190 at 21 (1998) .................................................................................. 8

**RULES**

Fed. R. Civ. P. 65 ......................................................................................................... 4

Fed. R. Evid. 407 .......................................................................................................... 4

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. I ..................................................................................................... 1

## 1.0   INTRODUCTION AND FACTUAL BACKGROUND

### 1.1    Welcome to America

Cheryl Bawtinheimer's YouTube Channel serves members and escapees from a cult known as the "Exclusive Brethren," or the Plymouth Brethren Christian Church (the "PBCC"). *See* Exh. 3 & 9. Among the Cult's business empire holdings is the Rapid Relief Team ("RRT"), which is identified by its trademark, a clip art bird (the "RRT Logo") (ECF No. 31 at 8).

RRT is a foreign entity which wants to silence a foreign critic. But RRT chose to do that on American soil.    We now have the privilege of showing RRT our *"profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."*[1]  RRT gets to learn about the First Amendment.

Why did RRT choose to settle its score with Ms. Bawtinheimer in the United States? Was it the perception of higher damages awards for plaintiffs?  Statutory damages?  Perhaps it was a perfunctory knowledge of the "American rule" where the parties presumptively pay their own fees.[2] Clearly, they felt that there was some advantage.  And perhaps there is, if you only look as far as statutory damages awards, or the perception that the party with the most money is at an advantage in our courts.  This was a miscalculation.  Those things may be true, and we have strong protections for intellectual property in the United States, but they are reined in by fair use.  Section 107 of our copyright act is a full-throated eagle's scream that the First Amendment does not abandon anyone at the altar of copyright claims.  And if you hire mercenaries to abuse someone on our soil, that victim of your actions will have the full protections of our laws, and those mercenaries will themselves be held to account.

Ms. Bawtinheimer may not enjoy the First Amendment in Canada.  The Australian plaintiff may be surprised at what our commitment to free speech means.  But our guests will go home from this dispute to tell their friends what the majesty of our Constitution and our commitment to wide open and robust debate is all about. We protect civil liberties for citizens and visitors alike.

---

[1] *New York Times v. Sullivan*, 376 US 254, 270 (1964) .
[2] But *see* 17 U.S.C. § 505.

### 1.2    Factual Background

The RRT's parent, the Exclusive Brethren, has a long history of censoring critics. In fact, it has a history of misusing copyright law to do so. *See, e.g.*, Laura Dyason & Bernard Doherty, *The Modern Hydra: The Exclusive Brethren's Online Critics: A Case Study of Cult Awareness Activism and Community Formation in Cyberspace*, 233 ST. MARK'S REV. 116, 124 (2015), attached as **Exhibit 1**;[3] ECF Nos. 26-24, 26-25, and 26-27. This case is part of its pattern and practice. And Bawtinheimer's podcast is part of the resistance against PBCC and its campaign to censor critics and terrorize those who leave the cult. *See* **Exhibit 2**, Declaration of Cheryl Bawtinheimer ("Reply Dec.") at ¶¶ 8-9; **Exhibit 3**. RRT started by abusing the DMCA process issuing clearly bad faith takedown requests. Ms. Bawtinheimer issued counter notifications. RRT doubled down and sued Ms. Bawtinheimer, and now they face counterclaims and a neutral court that should have no difficulty evaluating the clear fair use here and protecting her speech.

## 2.0    THE LEGAL AND FACTUAL ISSUES ON REPLY

### 2.1    YouTube's Copyright Policy and Its Effects

Trying to avoid an injunction, RRT makes a false claim that YouTube's DMCA policy is an independent adjudication of fair use, and that *YouTube* somehow adjudicated the copyright dispute. ECF No. 31 at 9-10 ("YouTube, not RRT, concluded that the videos should be taken down"). RRT, its counsel, and anyone who has ever used the Internet, knows that all YouTube does is review DMCA notices for technical requirements like the signatory swearing under penalty of perjury that the use is infringing. YouTube does not make independent fair use determinations. *See* "Fair use on YouTube," attached as **Exhibit 4**.[4] YouTube is not a copyright arbitration service. If the DMCA notice looks like a valid notice, YouTube removes the content, presuming that the person sending the DMCA notice under penalty of perjury was telling the truth. If Counterclaim-Defendants want to play it that way, then YouTube replaced the content when Bawtinheimer issued

---

[3] Available at: https://www.academia.edu/23637750/The_modern_Hydra_the_Exclusive_Breth rens_online_critics_A_case_study_of_cult_awareness_activism_and_community_formation_in_ cyberspace.

[4] Available at: https://support.google.com/youtube/answer/9783148?hl=en.

a counter-notification claiming fair use. Does RRT concede that this "independent arbitration" established fair use?[5] Of course not, but there is *little* consistency in the opposition.

What YouTube *does* do is decide who is a "repeat infringer," basing this entirely on how many DMCA notices it has to process. *See* Laura Edelson, "Content Moderation in Practice," 3 J. FREE SPEECH L. 183, 188 (2023) (citing to YouTube guidelines at https://perma.cc/6WPD-B2R3 and at https://perma.cc/Y6DC-FZHN.) After YouTube receives a DMCA notice, the user gets a warning. *Id.* After three strikes in a 90-day period YouTube shuts down the user's channel. *Id.* If that happens, users lose the ability to have another channel and lose all of their content. *Id.*

YouTube's Strike System is frequently weaponized by would-be censors, especially since it is difficult to visit any consequences upon an abusive party for dishonest DMCA notices.[6] Meanwhile, even a single copyright strike is damaging. Even one strike prevents a creator from live-streaming for a week. YouTube, Understand Copyright Strikes, attached as **Exhibit 5**.[7]

Abusive Copyright strikes are not a mere inconvenience; they are an existential threat. Because of RRT's DMCA abuse, Bawtinheimer is sitting at the 2-strike threshold. Reply Dec. at ¶¶ 10-11; **Exhibit 6**. One more strike and she will lose her channel. Bawtinheimer will not be able to re-upload her videos on YouTube, not even on a new channel. She will lose the following she has accumulated over the years, destroying her goodwill among viewers. Reply Dec. at ¶¶ 12-13. And just as bad, those who depend on her channel, both inside and banished from the Exclusive Brethren cult will lose their access to this information and support. *Id.* at ¶¶ 6-7.

RRT claims to offer an alternative, that Bawtinheimer simply upload new versions of the complained-of videos with the RRT Logo removed. They claim that Bawtinheimer has "*voluntarily decided to create this controversy by refusing to edit her videos to remove the infringing material . . . .*" ECF No. 31 at 17. That logic is busted. Bawtinheimer made five videos that she had every right to make. RRT decided that it did not like them. Well then, Sheriff Sullivan

---

[5] The videos came back down after this lawsuit was filed, pursuant to YouTube's policies, so they are down again, and Ms. Bawtinheimer must seek this Court's assistance to restore them.
[6] The only recourse is a lawsuit under 17 U.S.C. § 512(f).
[7] Available at: https://support.google.com/youtube/answer/2814000.

only wanted *a few edits* to "Heed Their Rising Voices" in *New York Times v. Sullivan*, 376 U.S. 254 (1964). But the New York Times "created a controversy" by not letting Sherriff Sullivan edit their newspaper. Larry Flynt could have just let Jerry Falwell edit Hustler Magazine but he "created" a controversy. *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988). By that logic, why have free speech cases at all, if you just wrongly "create controversy" by refusing to give in to censors?

RRT chose, and chooses, conflict here. RRT can moot this motion by withdrawing the DMCA notices, without prejudice to its rights to adjudicate this dispute.[8] If RRT really is confident that the videos are infringing, it has an active copyright infringement suit pending. It can continue to press for adjudication here. And if their infringement theory turns out to be correct, money can compensate them for copyright infringement. It cannot compensate Bawtinheimer or her community for the censorship that RRT got without the slightest bit of judicial review.

RRT's position is not just morally and legally invalid, but it is a false offer. Even if Bawtinheimer put up the *exact same videos again unmolested*, it would not cure the existing strikes. Further, the information suppressed by the DMCA notices is *not just what we find in the videos themselves*. Each video had backlinks from across the internet leading to them, user views, which matter for page ranking, and significant engagement in the comments. All of this is lost even if RRT says "go ahead and put them back up." Bawtinheimer needs the precise videos restored. Reply Dec. at ¶¶ 14-15. What RRT took away cannot be replaced with edited videos, even if the suggestion to "just let the subject of your criticism edit your content" were valid.

### 2.2    Injunctive Relief is Available Threefold

Counterclaim-Defendants argue that 17 U.S.C. § 512(f) does not provide for injunctive relief. Why they bother with this argument is unclear. If we get to relying on 512(f), something has gone woefully wrong. Bawtinheimer has a right to injunctive relief as a mere defendant without counterclaims, as Fed. R. Civ. P. 65 does not premise a preliminary injunction on a claim.

---

[8] And if RRT does so, Bawtinheimer expressly waives any argument that withdrawing the DMCA requests is in any way an admission of wrongdoing. This will be a subsequent remedial measure under FRE 407. Even if it isn't, Bawtinheimer stipulates that it should be treated as one.

She is also entitled to injunctive relief under her declaratory judgment claim. *See Youth 71Five Ministries v. Williams*, 160 F.4th 964 (9th Cir. 2025). Nevertheless, the argument that § 512(f) does not allow for injunctive relief is false. *See Hollister v. Sims*, 2026 U.S. Dist. LEXIS 47709, *8-13 (C.D. Cal. Jan. 30, 2026) (preliminary injunction enjoining the sending of future DMCA takedown notices and requiring withdrawal of pending DMCA complaints in a 512(f) claim); *Invisible Narratives v. Next Level Apps Tech.-FZCO*, 2025 U.S. Dist. LEXIS 29888, *8-11, 14-15 (N.D. Cal. 2025) (same). And while Counterclaim-Defendants rely on *Stardock Sys., Inc. v. Reiche*, 2018 U.S. Dist. LEXIS 222971 (N.D. Cal. Dec. 27, 2018), for the proposition that such an injunction exists, but subject to a heightened standard of proof, the more recent cases make no mention of such a standard. Counterclaim-Defendants position that injunctive relief cannot issue doesn't make a bit of sense, and is not even consistently presented by them.

### 2.3     Bawtinheimer is Likely to Prevail on Her Declaratory Judgment Claim

Bawtinheimer's declaratory judgment claim is solely that her use is fair use. All four of the fair use factors either favor her or are neutral. If the Court finds that the use of a logo to identify a company being criticized is fair use, substantial likelihood is established. But, if it does not, then what does fair use even mean?

If RRT's theory prevails, then this district should be a destination for all future censorship campaigns. If a reporter takes a photo of Donald Trump in front of Mar-a-Lago, and the Mar-a-Lago logo gets into the picture (and Trump doesn't like the content): Presto! DMCA. No fair use! Imagine if RRT's theory were in place when reporters wrote about Jeffrey Epstein: You can't use his photo to identify him. News reports about Enron would have required a license from Enron's logo designer. Bawtinheimer is not only likely to prevail, but this Court would need to reinvent copyright law and the First Amendment in order to deny relief.

#### 2.3.1    The Purpose and Character of the Use is Classic Fair Use

The waters of Silfra are not as clear as this fair use.

RRT argues that RRT uses its logo to identify itself, so it is not fair use for Bawtinheimer to use the RRT logo to identify RRT, because that's the same way that RRT uses its logo.

The Court has the videos. ECF Nos. 26-15 to 26-16, 26-20 to 26-22, and Bawtinheimer presumes (and prays) that the Court watch them before the hearing. One need do little more than that to answer the question presented. Each use of the RRT Logo is in the context of someone commenting on RRT and its website, where the logo is displayed. Criminals walking out of court who do not want to be on the news should just wear a shirt with a logo on it. All the news cameras would need to fold up, because the perp is wearing an original design.

Just as it is necessary and expected to use a person's photo when commenting on or criticizing them (*see Dhillon v. Doe*, 2014 U.S. Dist. LEXIS 24676, *14-15 (N.D. Cal. Feb. 25, 2014); *Hannley v. Mann*, 2023 U.S. Dist. LEXIS 40022, *13-14 (C.D. Cal. Mar. 8, 2023); *Katz v. Chevaldina*, 2014 U.S. Dist. LEXIS 88085, *18-19 (S.D. Fla. June 17, 2014), it is necessary and expected to use a company's logo when reporting on that company. Counterclaim-Defendants make no effort to explain why their persona/logo is special or different. It isn't.

Counterclaim-Defendants rely on *Andy Warhol Found. For the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023). *Warhol* supports the fair use argument. Andy Warhol used the Campbell's soup logo in paintings was for "an artistic commentary on consumerism, a purpose that is orthogonal to advertising soup." 598 U.S. at 539. He wasn't even commenting on Campbell's soup, nor its logo, but on "consumerism." That is not as clear fair use as what we have here. RRT uses its logo to advertise its services. Bawtinheimer used the logo to talk about RRT. Counterclaim-Defendants then refer to *separate* Warhol works depicting Prince, but ignore that the Court found those Warhol uses were not fair because they were simply the same thing – depicting Prince in an artistic rendition. *Warhol* does nothing to support RRT.

News coverage almost always displays logos when discussing the subject of a story. A news station recently published a video interview with Bawtinheimer about this lawsuit. 10 News, "'They Tried to Silence Me': Survivor Exposes Allegations Against Aussie Church | 10 News+," YouTube (Apr. 13, 2026), attached as **Exhibit 7**.[9] Despite providing no commentary or criticism

---

[9] Available at: https://www.youtube.com/watch?v=bmFK7mGHfQk&t=2s.

Reply in Support of Motion for a Preliminary Injunction
Case No. 4:25-cv-10864-JST

at all about the RRT Logo, 10 News displayed depictions of the Logo at several points during the interview. *See id.* at 0:17-0:20, 0:24-0:31, 2:15-2:33, 2:55-2:59, and 3:49-4:00.[10]

Brown Rudnick understands the concept of using a company's logo when discussing that company. *See* B&R blog posts displaying NCAA logo,[11] UniCredit logo,[12] and Alaska Airlines logo, **Exhibit 8**.[13] Are they violating the designers' copyrights? Of course not.

Counterclaim-Defendants emphasize the allegedly commercial use of the RRT Logo, because Bawtinheimer's videos were monetized to the tune of *tens* of dollars. The fact that commentary is monetized is irrelevant. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579, 584 (1994) (observing that "news reporting, comment, criticism, teaching, scholarship, and research . . . 'are generally conducted for profit in this country'"). RRT expects us to accept that the song in *Campbell v. Acuff-Rose* was not actually fair use because 2 Live Crew didn't give it away for free? Is fair use in journalism only permitted if the content is given away on a leaflet for free, with no advertisements? Are Brown and Rudnick's blog posts not for advertising purposes, including trying to convince the public of their expertise in *inter alia* copyright law?

### 2.3.2 The Copyrighted Work is Informational

RRT admits that its Logo serves an informational purpose, to identify RRT's goods and services. ECF No. 31 at 6, 25. Just as a person's headshot used to identify them is informational (*see Dhillon*, 2014 U.S. Dist. LEXIS 24676 at *15), a corporate logo used to identify that corporation is informational. This nominative purpose of the logo weighs in Bawtinheimer's favor.

---

[10] In fact, when one sees just how much and how many times they used the logo, it is clear that the producer was mocking RRT's position and daring them to take on a well-funded defendant, rather than bullying Ms. Bawtinheimer.

[11] (Dec. 10, 2025), available at: https://briefings.brownrudnick.com/post/102lxfy/athletes-nil-and-the-power-of-owning-your-story.

[12] (Sept. 23, 2024), available at: https://briefings.brownrudnick.com/post/102jjz7/my-word-is-my-bond-russian-energy-company-must-arbitrate-against-german-bank-in.

[13] (June 19, 2024), available at: https://briefings.brownrudnick.com/post/102jalo/alaska-airlines-must-pay-to-use-virgin-brand-even-though-it-is-not-using-the-bran.

### 2.3.3    The Amount and Substantiality is Irrelevant in this Context

Bawtinheimer's videos indeed display the entire RRT Logo, while criticizing the very content on RRT's website alongside which the logo is shown. RRT claims this is "excessive." Should Bawtinheimer have only shown the wings? The beak? RRT identifies no authority for the proposition that Bawtinheimer was required to redact the Logo. This factor weighs in Bawtinheimer's favor. *See, e.g., Bouchat v. Baltimore Ravens*, 737 F.3d 932 (4th Cir. 2013).

### 2.3.4    There is no Effect on the Market for the Original

RRT argues: "Setting the precedent requested by Defendant that anyone may freely use the Logo if they in some way comment upon or criticize RRT would lead to such an adverse result." (ECF 31 at 27). Yes. Except that precedent is already "set." Anyone who wants to criticize Mar-a-Lago can use its logo in a story about Mar-a-Lago. Any law firm who wants to comment on Alaska Airlines can use a photo of one of its planes with its copyrighted artwork on the tail. Bloomberg will be able to report on Apple or Tesla, and display their logos during segments on their stock performance or criticizing Elon Musk or Tim Cook or discussing Steve Jobs' legacy.

Market harm is about *supplanting* the use of the original.

### 2.4    Bawtinheimer is Likely to Prevail on Her 512(f) Claim

Once the Court concludes that Bawtinheimer's use is a fair use, the Court need not address the 512(f) claim. Nevertheless, a fulsome response to the Opposition may assist the Court. RRT's lawyers signed DMCA notices for the purpose of censoring criticism, which is an abuse of the DMCA takedown system. *Online Pol'y Grp. v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1204-05 (N.D. Cal. 2004) (copyright holders may not wield DMCA takedowns "as a sword to suppress publication of embarrassing content rather than as a shield to protect its intellectual property").

When the DMCA was being debated, a Senate Report on Section 512(f) explained that it was concerned that material should not be censored without proper justification: "The provisions in the bill balance the need for rapid response to potential infringement with the end-users['] legitimate interests in not having material removed without recourse." S. REP. NO. 105-190 at 21 (1998). Therefore, congress sought to discourage DMCA abuse with Section 512(f).

Misrepresentations actionable under that section include takedown notices that target fair use because fair use is "wholly authorized by the law." *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1151 (9th Cir. 2016). Thus, before sending a DMCA notice, the *signatory* must have a "good faith belief" that the law does not authorize the use. *Id*. at 1154-55.

Counterclaim-Defendants seem to be under the impression that the standard under 512(f) requires nothing more than a statement that the signatory *considered* fair use, meaning the test is *purely* subjective. And indeed, most cases favor that position. *See generally*, Marc J. Randazza, "*Lenz v. Universal*: A Call to Reform Section 512(f) of the DMCA and to Strengthen Fair Use," 18 VANDERBILT J. OF ENT. AND TECH. L. 743 (2020), which Counterclaim-Defendants cite as if they discovered a confession. The undersigned is well aware of the *Rossi/Lenz* machinery and how much censorship it has licensed. It must have *some* limit.

Despite the density of the *Rossi/Lenz* standard, the 512(f) claims here are strong. To date, 512(f) cases focused on copyright *owners* sending DMCA notices – not *experienced copyright counsel* signing the DMCA notice. This case may have *Rossi/Lenz* genetic material, but it is a separate species. In *Rossi*, the Defendant advertised that his website contained piracy. *Rossi v. Motion Picture Ass'n of Am., Inc.*, 391 F.3d 1000, 1002 (9th Cir. 2004). He was lying, but one cannot blame the signatory of the DMCA notice for taking Rossi at his word. And in *Lenz*, the notices were signed by Sean Johnson, an assistant in Universal Music's legal department. Sean was not legally trained and was due some grace as someone uneducated on copyright law. Experienced and top price copyright lawyers who sign that DMCA notice under penalty of perjury should be held to a different standard of knowledge and "consideration" than Sean.

If the term "good faith" is not mere surplusage in the statute, it should at least mean that there is a point at which that DMCA notice could only be issued with falsity, willful blindness, or reckless disregard. *Rossi* may have licensed being too lazy to click on a link to confirm whether there is infringement there. And *Lenz* may have given grace to a legal assistant who gets a little too caught up in his job. But would *Rossi/Lenz* let Mel Nimmer, Mitch Stolz, or Eric Goldman simply state in a DMCA notice that they had "considered" fair use, no matter how obviously they

- 9 -
Reply in Support of Motion for a Preliminary Injunction
Case No. 4:25-cv-10864-JST

did not?[14] Willful blindness may be used to determine whether a defendant has knowingly misrepresented that their good faith belief the offending activity was not fair use. *Lenz* at 1155. *See also Executive Lens LLC v. Rapkin,* 2026 U.S. Dist. LEXIS 58448, at *9-10 (N.D. Cal. Mar. 19, 2026). No reasonable attorney could have believed that the use here was not fair use under Section 107 unless they were reckless, willfully blind, or they simply failed to consider all four factors (and considering less than four factors is not "*considering*" fair use). The likelihood of success on the merits of the 512(f) claim, at least, against Brown Rudnick and its attorneys, is substantial enough that they can be told by this Court, at this stage, "Don't do that again."

### 2.5   Bawtinheimer Has Shown Irreparable Harm

Counterclaim-Defendants argue that Bawtinheimer has not suffered irreparable harm because RRT claims it would allow her to repost the videos if she just removed any use of the RRT Logo. Bawtinheimer does not petulantly say "I should not have to" - although that *is* enough. As discussed in Sect. 2.1, *supra,* the strikes and disablement of the videos are creating irreparable harm that can only be cured by lifting the take down notice. It cannot be remedied by reposting the same video again, with or without the logo. Her irreparable harm can only be remediated by reinstating the original videos, at the original URLs, with the original likes and comments.

Reposting the videos anew, even if they were not subject to RRT editorial control, would do nothing to recover the algorithmic value of the former videos, resulting in a loss of followers on YouTube, associated goodwill, and the community conversation that ensued under them. Reply Dec. at ¶¶ 13-15. And with new videos come new URLs, meaning that everyone across the Internet who linked to her original videos will now be linking to dead air. *Id.* The "new" videos will languish, unviewed, and unable to be found without difficulty.

Meanwhile, the irreparable harm is also visited upon the broader community. The Get-A-Life Podcast is a haven for PBCC survivors, many of whom have written to Bawtinheimer to express how her podcast is a lifeline to them. Reply Dec. at ¶¶ 18-19; letters from Get-A-Life

---

[14] Not to suggest that they would ever do so.

-10-
Reply in Support of Motion for a Preliminary Injunction
Case No. 4:25-cv-10864-JST

listeners, attached as **Exhibit 9**. All of this will be lost if Bawtinheimer receives three copyright strikes under YouTube's policies. Because these substantial injuries are "not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel." *Williams v. Lobel Fin. Corp.*, 673 F. Supp. 3d 1101, 1108 (C.D. Cal. 2023); *see also Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (reputational harm and loss of goodwill is irreparable harm).

*Amaretto Ranch Breedables v. Ozimals, Inc.*, 2010 U.S. Dist. LEXIS 141242 (N.D. Cal. Dec. 21, 2010), granted the same injunctive relief Bawtinheimer seeks. The Court there enjoined bogus DMCA notices finding that the plaintiff had "established a likelihood of irreparable harm if Second Life complies with the DMCA Takedown Notification." *Id*. at *7. The court noted that a disruption to the sale of allegedly infringing products during "prime buying season" would likely cause a permanent loss of customers, thus establishing irreparable harm. *Id*.; *see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm"). Bawtinheimer similarly faces a permanent loss of the audience for whom she creates her content and that audience is not here for entertainment. This loss would be an especially dire consequence for the victims of the PBCC whose only lifeline is the Get-A-Life Podcast. Reply Dec. at ¶ 18; Exh. 3 & 9. With 2 pending copyright strikes due to RRT's bad-faith DMCA notices, this potential harm is greater, but it is not just about new strikes. The old videos need restoration.

### 2.6    The Balance of Hardships Tips in Bawtinheimer's Favor

If Bawtinheimer's requested relief is granted, she will continue to comment on PBCC and the RRT, and to create a home for lost cult members to find support. Reply Dec. at ¶ 19.

Lost content hurts Bawtinheimer. Further DMCA notices will result in the termination of the YouTube channel (Exhibit 5) and thus the loss of not just all Bawtinheimer's existing videos but her subscriber base. RRT claims that Bawtinheimer "attempts to concoct a sense of urgency by speculating, disingenuously, that RRT will issue additional takedowns if she reuploads the videos without the inclusion of the Logo" - no. Bawtinheimer takes RRT at its word that it will

not issue takedown notices unless it can concoct a copyright infringement claim. But Bawtinheimer has the right to show the Logo, the same as every other news outlet. *See* **Exhibit 7**. And if not the logo, Bawtinheimer regularly posts content that contains RRT and its parent corporation's materials for comment and criticism. If this Court wipes away the most obvious fair use, RRT will not stop there. But we do not need speculation. Bawtinheimer *fully intends to publish new videos with the logo identifying who she is criticizing.* But she cannot do that unless this Court gives her the relief she seeks. Otherwise, strike three is looming over her head.

The burden on RRT is nothing. They merely must withdraw frivolous DMCA notices and refrain from submitting further notices with unsubstantiated claims of infringement. If they seriously face any harm from allegedly infringing videos, they can amend their complaint to include any new videos they want and seek injunctive relief here, in this court, rather than seeking expedited injunctive relief with DMCA notices.[15]

### 2.7    The Injunction Will Serve the Public Interest

"The public interest portion of the preliminary injunction test asks, 'whether there exists some critical public interest that would be injured by the grant of preliminary relief.'" *Ozimals*, 2010 U.S. Dist. LEXIS 141242 at *8 (quoting *Independent. Living Ctr. of So. Cal., Inc. v. Maxwell–Jolly*, 572 F.3d 644, 659 (9th Cir. 2009)). Here, there is no public interest that will be negatively affected by granting the "no more censorship without judicial review" injunction.

In fact, the public has an interest in being able to view legitimately produced Get-A-Life content, which would be adversely affected if an injunction does not issue and RRT can keep disabling videos. This is a channel that performs a public service. According to just one of her listeners, "*As a gay man, leaving was not simply about stepping away from a belief system. It meant trying to rebuild an identity that had been suppressed and shaped by fear for most of my*

---

[15] Bawtinheimer acknowledges that the court in *Stardock* disagreed with this conceptualization of the DMCA takedown process. *Stardock* is faulty and relied on an unrealistic view of the automated nature of YouTube's DMCA takedown system. But in any event, that case is non-binding and is contradicted by more recent cases from this and other federal courts in California. *Invisible Narratives*, 2025 U.S. Dist. LEXIS 29888; *Sims*, 2026 U.S. Dist. LEXIS 47709.

*life. Hearing others speak openly about these experiences helped reduce the shame and confusion I had carried for years, and made me realize I was not alone.*" **Exhibit 9**, Ben Woodbury email. Another said "*[t]he MAIN REASON that I am where I am today, still alive, not depressed, not in a mental clinic, free, happily still married with my husband, with our two children and a fulfilling life, is because of the Get A Life Podcast videos. I didn't have to end my life end my suffering, I was able to gain freedom! These Podcasts saved my life.*" *Id.*, MacKinnon email. The public also has an interest in knowing that the DMCA process cannot be misused with zero consequences. These videos must be allowed to go back online because, as discussed in the initial Motion and in the Counterclaim, PBCC members who find themselves outside the walls of that cult find no support and are at great risk of mental health complications and even suicide. ECF No. 26 at ¶¶ 4-14, 64-68. Meanwhile, what public interest is served by permitting this kind of abuse of the DMCA process? Is the public clamoring for content about the PBCC that makes it difficult to identify them? The public would only gain from the requested injunction.

### 2.8    RRT's Concerns About a Mandatory Injunction are Fictional

Counterclaim-Defendants argue that Bawtinheimer seeks a mandatory injunction, and thus must satisfy a more demanding standard, showing that "the law and facts clearly favor her position . . . ." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). Even if it were true, Bawtinheimer meets the heightened standard.

First, the injunction requests (in part) that RRT be prohibited from sending any more DMCA notices or other legal threats regarding the videos at issue or any other clearly non-infringing videos, and to seek approval from this Court before sending any further DMCA notices. RRT seems to just want to forget that this is part of what was requested. If RRT feels that Bawtinheimer does eventually step over the line into copyright infringement, no matter how flimsy the claim, RRT has an open case where it can seek a temporary restraining order.

With respect to the injunctive relief requesting that the DMCA notices be withdrawn, RRT's argument avoids the purpose of a preliminary injunction, which is to restore the status quo ante. "The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but

RANDAZZA | LEGAL GROUP

instead to 'the last *uncontested* status which preceded the pending controversy.'" *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (citations omitted) (emphasis added).

The status quo was that Bawtinheimer was operating her YouTube channel free from strikes and being able to exercise editorial control over her own content. The content went down because of RRT, back up because Bawtinheimer filed a counter-notification, and went back down because this complaint was added to the chain. If the Court's authority of granting RRT a docket number is why the videos are down, the Court certainly can and should use its power to restore the status quo ante, or to at the very least, not permit future DMCA notices without reviewing them.

Mandatory injunctions are not simply those that require a party to do an act as opposed to refrain from doing an act. Rather, they are injunctions "that disturb the status quo by ordering affirmative relief . . . ." *Johnson v. Kay*, 860 F.2d 529, 541 (2d Cir. 1988). Thinking of injunctions in binary terms leads to easily manipulable semantic games. For example, what is the difference, aside from label, between a prohibitory injunction that prevents a defendant from infringing a plaintiff's copyright in an image and a mandatory injunction that requires the plaintiff to remove an infringing image from their website? It is much more important to determine what the status quo is and what would disrupt it.

Even if the Court were inclined to treat the requested injunction as mandatory, such injunctions are appropriate when "the status quo . . . is exactly what will inflict the irreparable injury upon complainant." *Hernandez v. Sessions*, 872 F.3d 976, 997 (9th Cir. 2017). As discussed in Section 2.5, *supra*, and in the Motion, the state of Bawtinheimer having her videos removed, strikes stacking up, and her channel losing momentum, traffic, and goodwill is not the status quo that should be reset by the court. Imagine if a burglar broke into your home and stole your manuscript. An injunction demanding that the manuscript be returned would not be offensive to any notion of justice. It appears RRT would argue "but the manuscript in my hands is the status quo," but that is not how the law works.

## 2.9    RRT's Timeliness Argument is Unfounded

Counterclaim-Defendants argue that Bawtinheimer waited too long to seek injunctive relief, but this is based on a faulty factual premise – that she should have sought relief the moment RRT started sending DMCA takedown requests. That is wrong, as initially the DMCA notice and counter-notice system was working as intended. At first, YouTube reinstated Bawtinheimer's videos when she submitted counter-notices establishing that her use of the RRT Logo was a fair use. It was not until January 29, 2026, that YouTube stopped reinstating the videos in light of this lawsuit. January 29, 2026, email from YouTube to Bawtinheimer, attached as **Exhibit 10**; Reply Dec. at ¶¶ 19-20. At that point, it was apparent to Bawtinheimer that injunctive relief was necessary. She moved as fast as she could. *Id.* at ¶¶ 21-22. It was not easy for her to find counsel. *Id.* It is an almost miraculous speed that she was able to find a lawyer in a foreign country, with pennies on the dollar in fundraising, to defend her with a full motion for a preliminary injunction all within 65 days.[16]

## 3.0    CONCLUSION

For the foregoing reasons, the Court should require the DMCA notices to be withdrawn, and should require any further DMCA notices to be either withheld or vetted by this Court prior to being issued.

Dated: April 27, 2026.                          Respectfully submitted,

RANDAZZA LEGAL GROUP, PLLC          C.A. GOLDBERG, PLLC
/s/ Marc J. Randazza
Marc J. Randazza, SBN 269535          Carrie Goldberg (*pro hac vice* forthcoming)
Alex J. Shepard, SBN 295058           16 Court St, 33rd Floor
8991 W Flamingo Rd., Suite B          Brooklyn, NY 11241
Las Vegas, NV 89147

*Attorneys for Defendant and Counterclaim-Plaintiff, Cheryl Bawtinheimer*

---

[16] Counterclaim-Defendants also bring up Bawtinheimer's alleged efforts to evade service, all of which occurred in mid-March 2026 or later. But their evidence consists of attempts at informal service and a few attempts at personal service, with no indication of evasion or even that they attempted to comply with the Hague Service Convention. This is a red herring.

Case No. 4:25-cv-10864-JST

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 27, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I further certify that a true and correct copy of the foregoing document is being served via transmission of Notices of Electronic Filing generated by CM/ECF.

Respectfully submitted,

/s/ Marc J. Randazza
Marc J. Randazza